**Daniel DONOHUE, individually and on behalf of all others similarly situated, Plaintiff,**

v.

**APPLE, INC., Defendants.**

**No. 11–cv–05337 RMW.**

United States District Court,
N.D. California,
San Jose Division.

May 10, 2012.

Kathryn S. Diemer, Diemer Whitman & Cardosi, LLP, San Jose, CA, Kevin K. Eng, Co-Lead Counsel, San Francisco, CA, Alex Stepick, IV, Mark Anthony Bulgarelli, Progressive Law Group, LLC, Chicago, IL, for Plaintiff.

Stuart Christopher Plunkett, Penelope Athene Preovolos, Morrison & Foerster LLP, San Francisco, CA, for Defendants.

## ORDER GRANTING MOTION TO DISMISS

RONALD M. WHYTE, District Judge.

Plaintiff Daniel Donohue ("plaintiff"), on behalf of himself and a class of similarly situated consumers, asserts claims against defendant Apple, Inc. ("Apple") related to a defect in the Apple iPhone that caused its "signal meter" to inaccurately reflect the strength of the device's cellular network connection. Apple moves to dismiss the First Amended Complaint ("FAC") under Fed.R.Civ.P. 12(b)(6) and Fed.R.Civ.P. 9(b). For the reasons below, the court grants Apple's motion. With the exception of plaintiff's California law-based warranty claim and claim for restitution, which are dismissed with prejudice, the court dismisses all claims with thirty days' leave to amend.

### I. BACKGROUND

The Apple iPhone is a wireless "smartphone" that enables users to make phone

calls, text message, email, check voicemail, use the internet, listen to music, watch videos and use software applications. FAC ¶ 15. The ability to use such features is contingent on the strength of the iPhone's connection to a wireless network, which varies depending on a user's location and other factors. *Id.* ¶ 16. Most cell phones, including the iPhone, contain a "signal meter" that informs the user of the strength of the phone's network connection. *Id.* ¶ 17.

### A. The iPhone Signal Meter and User Guide

The iPhone signal meter consists of a graphic showing one to five "bars." *Id.* The number of bars appearing at any given time purports to correspond to the strength of the phone's connection to the wireless network. *Id.* When the iPhone has no network connection, the bars are replaced with the phrase: "No Signal." *Id.* ¶ 21. The iPhone signal meter is "prominently" displayed in the upper left hand corner of the screen at virtually all times while the device is in use. *Id.* ¶ 18.

The iPhone "User Guide" is an instructional manual that describes the product's "capabilities, specifications and functionality." *Id.* ¶ 20. An online version of the User Guide "come[s] with the purchase" of an iPhone. *Id.* The User Guide "indicates that the signal meter . . . 'shows whether you're in range of the cellular network and can make and receive calls.'" *Id.* ¶ 21. For example, the User Guide instructs consumers who are having trouble making a phone call or accessing an internet website to "Check the cell signal icon in the status bar at the top of the screen. If there are no bars, or if it says 'No Service,' try moving to a different location. If you're indoors, try going outdoors or moving closer to a window." *Id.* ¶¶ 22–23.

### B. Flaw in the iPhone Signal Meter

Cell phone signal meters employ various formulas to calculate how many bars to display for a given signal strength. *Id.* ¶ 46. While some smartphone manufacturers incorporate formulas recommended by wireless network providers, Apple opted to use its own "secret" formula in its design of the iPhone signal meter. *Id.* ¶¶ 32, 45, 46. In developing this formula, Apple conducted testing in "anechoic chambers where no waves (sound or electromagnetic) can reflect off anything, so there is absolutely no interference." *Id.* ¶ 34. Apple concealed its use of this testing process, which "manifests an artificial environment for signal strength." *Id.* Apple also spent less time testing the iPhone than other smartphone vendors before releasing the product. *Id.* ¶ 33. As a result of these alleged inadequacies, the formula underlying the iPhone signal meter was flawed, and often "misled consumers as to the quality of their connection by inflating the apparent strength-of-connection beyond the actual strength-of-connection." *Id.* ¶ 25.

On July 2, 2010, after receiving a "flurry of complaints" about the recently released iPhone 4, *id.* ¶ 37, Apple issued a public letter addressed to "iPhone 4 Users" (the "July 2 Letter"). *See* Dkt. No. 31–1. The July 2 letter indicated that "the formula we use to calculate how many bars of signal strength to display is totally wrong . . . For example, we sometimes display 4 bars when we should be displaying as few as 2 bars." *Id.* The letter further acknowledged that the "mistake" had been present since the release of the original iPhone. *Id.* "To fix this," the letter stated, "we are adopting [wireless provider] AT & T's recently recommended formula for calculating how many bars to display for a given signal strength." *Id.* Apple assured consumers that a free software update incor-

porating the corrected formula would be available to users of the iPhone 4, iPhone 3GS and iPhone 3G "within a few weeks." *Id.* Apple released the promised update on or about July 15, 2010. FAC ¶ 45.

### C. Plaintiff's iPhone Purchase and Related Harms

Plaintiff purchased an iPhone at an Apple retail store in Seattle, Washington in January 2010. *Id.* ¶ 51. At the time of his purchase, the sample iPhone displayed at the store "appeared" to accurately represent signal strength. *Id.* After his purchase, plaintiff used the iPhone signal meter to provide him with information about whether he could expect to rely on a signal when making or answering calls and using email or the internet. *Id.* ¶ 52. He asserts that he experienced "dropped" calls that he did not expect to be dropped, and that he would have "refrained from making such calls or expected a higher likelihood of such calls being dropped if he had known that his connectivity was less that was apparent on the iPhone display." *Id.* ¶ 54.

According to plaintiff, the defective nature of the iPhone signal meter, which "substantially inflate[ed] customer perception of signal strength," would be "important to know [about] in deciding [whether] to purchase [an] iPhone or return it within 30 days after purchase," the period during which consumers can return the device for a full refund. *Id.* ¶¶ 60, 29. Plaintiff claims that he had been "seriously considering buying a competing phone before electing to purchase his iPhone," and that knowledge of the iPhone's signal meter flaw would have "materially affected" his decision to purchase the iPhone or return it within 30 days. *Id.* ¶ 60. Plaintiff claims that his lack of knowledge was a consequence of Apple's failure to disclose information that the company knew, or reasonably should have known, would be of interest to potential iPhone purchasers. *Id.*

Plaintiff also alleges that the value of an iPhone that inaccurately reports signal strength is less than the value of the same iPhone without the flaw. *Id.* ¶ 57. In addition, plaintiff claims that the strength-of-signal flaw diminished the resale value of any iPhone purchased prior to July 14, 2010. *Id.* ¶ 61. Finally, plaintiff notes that because the software update could only be installed on the iPhone 3G, 3GS and 4G models, consumers with older models were left "without a 'fix' for the signal strength flaw." *Id.* ¶ 50.[1]

### D. Procedural Background and Class Allegations

On November 3, 2011, plaintiff filed the instant action on behalf of (1) himself; (2) a class of "all persons who purchased an iPhone at retail in the United States at any time on or before July 14, 2010" (the "class"); and (3) a subclass of "all persons who purchased an iPhone at retail in the State of Washington at any time on or before July 14, 2010" (the "Washington subclass"). *Id.* ¶ 9. The FAC, which forms the operative pleading for purposes of this motion, alleges claims for (1) breach of contract and the duty of good faith and fair dealing; (2) breach of implied warranty; (3) breach of express warranty; (4) violations of the Magnuson Moss Warranty Act ("MMWA"); (5) violations of Cal. Bus. & Prof.Code § 17200 ("UCL"); (6) violations of the Consumer Legal Remedies Act ("CLRA"); (7) violations of the Washington Consumer Protection Act ("WCPA"); and (8) restitution.

---

1. It is not clear from the complaint or Apple's responsive briefing how many different iPhone models included the flawed signal meter.

## II. DISCUSSION

### A. Standing

#### 1. Plaintiff's standing to bring claims on his own behalf

Apple first argues that plaintiff lacks standing to sue because the defective performance of the iPhone signal meter did not cause him any cognizable injury. In order to confer standing under Article III of the federal constitution, a plaintiff's injury must constitute "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (internal citations and quotation marks omitted). Injury is particularized if it affects the plaintiff in a "personal and individualized way." *Id.* at 561 n. 1, 112 S.Ct. 2130. The injury may be minimal. *Preminger v. Peake*, 552 F.3d 757, 763 (9th Cir.2008). When standing is challenged on the basis of the pleadings, the court "accept[s] as true all material allegations of the complaint, and ... construe[s] the complaint in favor of the complaining party." *Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

 Standing to sue under the UCL requires plaintiff to demonstrate that he or she has personally suffered "*economic* injury." *Kwikset Corp. v. Superior Court*, 51 Cal.4th 310, 323, 120 Cal.Rptr.3d 741, 246 P.3d 877 (Cal.2011) (emphasis added). The requirement that injury be economic renders standing under the UCL "substantially narrower than federal standing ... which may be predicated on a broader range of injuries." *Id.* at 324, 120 Cal. Rptr.3d 741, 246 P.3d 877.[2] Economic injury may result from unfair competition if a plaintiff: (1) surrenders in a transaction more, or acquires in a transaction less, than he or she otherwise would have; (2) has a present or future property interest diminished; (3) is deprived of money or property to which he or she has a cognizable claim; or (4) is required to enter into a transaction, costing money or property, that would otherwise have been unnecessary. *Id.* at 323, 120 Cal.Rptr.3d 741, 246 P.3d 877.

Apple contends that because the iPhone signal meter only "reports" the strength of the network signal but does not affect the "actual signal strength, the iPhone's performance, or its call quality," the signal meter cannot cause economic injury. Dkt. No. 33 at 1. Apple compares the signal meter to a gauge on a car that displays ambient air temperature but has no impact on the weather outside, and thus no real effect on the car's driver. As Apple sees it, plaintiff's ability to use his iPhone "was what it was ... irrespective of how the signal meter read." *Id.* at 7.

Plaintiff proposes a different automobile-related analog: the fuel gauge. According to plaintiff, "in both cases, the consumer is directed to the readout to acquire information about the product's status and utility, information they need to use the product for the purpose for which they bought it." Dkt. No. 40 at 3. By plaintiff's logic, an iPhone with no network connection while the signal meter shows two bars is like a car that runs out of gas while the fuel gauge indicates that the tank is still forty percent full. Therefore, he claims that his iPhone was less valuable as a result of the signal meter defect, and that he and the other class members suffered economic injury in the form of "lost money or property, including [the] reason-

---

**2.** Apple does not argue that any *additional* injury is required for standing under the WCPA or CLRA. The court will therefore infer that if plaintiff has standing to sue under the UCL, he has standing to bring his other claims as well.

ably calculated economic value of their iPhones." *Id.* ¶ 133.

■ Although both analogies suffer shortcomings, the court finds plaintiff's arguments and cited authorities more persuasive. A defective signal meter clearly has some impact on a user's experience with his iPhone—he might choose to make an important call based on the meter's readout only to have it inexplicably dropped or waste time moving from place to place in a quixotic search for "more bars." Thus, even if the signal meter cannot *cause* a dropped call or a slow download, a consumer faced with the choice of whether to purchase an iPhone with an accurate signal meter or an inaccurate signal meter would unquestionably choose the former. It is therefore reasonable to infer that a consumer who unknowingly buys an iPhone with a defective signal meter "acquires in a transaction less" than he or she would have absent the defect. *Kwikset,* 51 Cal.4th at 323, 120 Cal.Rptr.3d 741, 246 P.3d 877. Construing plaintiff's allegations in the most favorable light, Apple's admitted "mistake" caused economic injury by depriving plaintiff of the "benefit of the bargain" for which he paid. *Kearney v. Hyundai Motor Co.,* No. 09–1298 DOC, 2010 U.S. Dist. LEXIS 68242, at *14 (C.D. Cal. June 4, 2010) (finding standing to bring diminution in value claims based on automobile airbag defects even when the alleged defects never materialized because "the loss was suffered at the moment of purchase"); *Trew v. Volvo Cars of N. Am.,* No. 05–1379 DFL PAN, 2006 WL 306904, 2006 U.S. Dist. LEXIS 4890 (E.D.Cal. Feb. 7, 2006) (claim that plaintiff would have paid less for a car had she known about a defect that could—but did not—cause her car to shake, surge or lose power was sufficient to confer standing).

Apple's attempt to distinguish *Kearney* and *Trew* on the basis that those cases concern "safety hazards" is unavailing. While a product defect that causes a safety hazard is certainly more likely to give rise to an actionable injury, neither the UCL nor Article III requires a plaintiff to show that his health has been put at risk to get through the courthouse doors. After all, injury for standing purposes is not a question of degree or genre, but of concreteness. *See Council of Ins. Agents & Brokers v. Molasky–Arman,* 522 F.3d 925, 932 (9th Cir.2008) (noting that "an identifiable trifle" is sufficient for standing) (quoting *United States v. Students Challenging Regulatory Agency (SCRAP),* 412 U.S. 669, 689 n. 14, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973)). Here, the diminution in the value of plaintiff's phone resulting from the defect may be minor, but it is-at least in theory-calculable.[3] Furthermore, because it is undisputed that the signal meter failed to function properly at the moment of purchase, plaintiff's injury is not "conjectural or hypothetical." *Lujan,* 504 U.S. at 560, 112 S.Ct. 2130; *compare Briehl v. GMC,* 172 F.3d 623, 628 (8th Cir.1999) (upholding dismissal of a product defect claim because "the Plaintiffs' ABS brakes have functioned satisfactorily and

---

**3.** The court remains extremely skeptical about plaintiff's ability to prove diminution in value damages, particularly for purchasers of the iPhone 3G, 3GS and 4G for whom Apple's software update "fixed" the alleged defect. However, as Apple has not raised this issue as an obstacle to standing, the court will assume as true plaintiff's allegation that he will be able to calculate diminution in value damages for all class members. *See Cole v. GMC,* 484

F.3d 717, 723 (5th Cir.2007) ("Plaintiffs seek recovery for their actual economic harm (e.g., overpayment, loss in value, or loss of usefulness) emanating from the loss of their benefit of the bargain ... Whether recovery for such a claim is permitted under governing law is a separate question; it is sufficient for standing purposes that the plaintiffs seek recovery for an economic harm that they allege they have suffered.").

at no time have the brakes exhibited a defect").

In addition, the California Supreme Court has clearly held that allegations of fraud and misrepresentation may support diminution in value claims even where safety hazards are not at issue. *See Kwikset*, 51 Cal.4th at 332, 120 Cal.Rptr.3d 741, 246 P.3d 877 (false marking of locksets as "Made in the USA" conferred standing to sue under Cal. Bus. & Prof.Code § 17200 because plaintiffs "bargained for locksets that were made in the United States; they got ones that were not"). Here, plaintiff claims that "Apple failed to disclose ... at the time of sale, that the iPhone [signal meter] was unreliable, incorrect [or] defective ... [and] that it was designed to depict inflated signal strength." FAC ¶ 149. As in *Kwikset*, Plaintiff alleges that knowledge of the undisclosed fact would have impacted his decision to purchase his iPhone or return it within 30 days of purchase. *Id.* ¶ 152; *see Kwikset*, 51 Cal.4th at 327–28, 120 Cal.Rptr.3d 741, 246 P.3d 877. That *Kwikset* involved an affirmative misrepresentation on the product's label rather that an omission of material fact is not dispositive of the standing inquiry; both may cause actionable injury under certain circumstances. *See, e.g., Falk v. GMC*, 496 F.Supp.2d 1088, 1098 (N.D.Cal. 2007) (denying motion to dismiss claims under the CLRA and UCL based on defendant automaker's failure to disclose known speedometer defect). Accordingly, the court finds that plaintiff's allegations establish an injury sufficient for standing under both the UCL and Article III.

The FAC also satisfies the requirement that plaintiff show that Apple caused the injury in question. In establishing causation in the context of a consumer protection claim, "it is not ... necessary that [the plaintiff's] reliance upon the truth of the fraudulent misrepresentation [or omission] be the sole or even the predominant or decisive factor in influencing his conduct.... It is enough that the representation has played a substantial part, and so has been a substantial factor, in influencing his decision. Moreover, a presumption, or at least an inference, of reliance arises wherever there is a showing that a misrepresentation was material." *In re Tobacco II Cases*, 46 Cal.4th 298, 326–327, 93 Cal.Rptr.3d 559, 207 P.3d 20 (Cal.2009). Here, plaintiff asserts that "had he known these material facts [about the signal meter defect] he would have considered purchasing a different mobile phone and/or asking for a timely refund." FAC ¶ 168. The court finds this allegation both plausible and enough to show causation for standing purposes. Consequently, the court rejects Apple's argument that plaintiff lacks standing to sue on his own behalf.

### 2. Plaintiff's standing to bring claims on behalf of purchasers of iPhone models that he did not purchase

While the FAC does not specify which iPhone model plaintiff purchased in January 2010, he concedes that he has only ever owned two models. *See* FAC ¶ 51. Apple contends, and plaintiff does not dispute, that based on the timing of his purchase, he did not buy the iPhone 4. Apple argues that plaintiff therefore lacks standing to bring claims on behalf of purchasers of that product and other models he has never owned. *See* Dkt. No. 33 at 8. In response, plaintiff contends that Apple's argument concerns not standing but the dimensions of the putative class, and should be addressed on a motion for class certification.

Courts in this circuit have diverged on the question of whether a named plaintiff has standing to sue on behalf of purchasers of a product that he or she did not purchase. *Compare Johns v. Bayer Corp.,*

No. 09–1935 DMS, 2010 WL 476688, at *5, 2010 U.S. Dist. LEXIS 10926, at *12–13 (S.D.Cal. Feb. 9, 2010) (purchaser of one vitamin product lacks standing to sue on behalf of purchasers of a different vitamin product made by the same defendant under the UCL or CLRA); *Carrea v. Dreyer's Grand Ice Cream, Inc.*, No. 10–1044 JSW, 2011 WL 159380, 2011 U.S. Dist. LEXIS 6371 (N.D.Cal. Jan. 10, 2011) (same) *with Carideo v. Dell, Inc.*, 706 F.Supp.2d 1122, 1134 (W.D.Wash.2010) (allowing named plaintiffs to sue over misrepresentations regarding computer models they did not purchase because all claims involved the "same core factual allegations and causes of actions"); *Bruno v. Quten Research Inst., LLC*, 280 F.R.D. 524, 530 (C.D.Cal.2011) (granting named plaintiff standing to sue on behalf of purchasers of related products and finding that "treatises and the vast majority of persuasive authority" indicate that this issue should be analyzed under Rule 23 rather than as a standing question). Apple, however, contends that the "more recent authority" supports denying standing for a non-purchaser under California unfair competition law. The case upon which Apple relies, *Mlejnecky v. Olympus Imaging Am., Inc.*, No. 10–2630 JAM, 2011 WL 1497096, 2011 U.S. Dist. LEXIS 42333 (E.D.Cal. Apr. 18, 2011), cited *Kwikset* for the proposition that because the named plaintiff could not claim "economic injury" from misrepresentations about products she did not buy, she lacked standing to sue on behalf of purchasers of such products. *See id.* at *4, 2011 U.S. Dist. LEXIS 42333 at *12.

■ This court respectfully disagrees with *Mlejnecky's* characterization of *Kwikset*, and finds that plaintiff has standing to assert claims on behalf of purchasers of other iPhone models. While *Kwikset* clarified the economic injury requirement for standing under the UCL, it did not purport to address whether a plaintiff who has suffered such an injury could represent a class of individuals who purchased distinct but similar products. Indeed, shortly before issuing its decision in *Kwikset*, the California Supreme Court explained that "representative parties who have a direct and substantial interest have standing; the question whether they may be allowed to present claims on behalf of others who have similar, but not identical, interests depends not on standing, but on an assessment of typicality and adequacy of representation." *In re Tobacco II Cases*, 46 Cal.4th at 319, 93 Cal.Rptr.3d 559, 207 P.3d 20 (internal citations omitted); *see also Bruno*, 280 F.R.D. at 530–31. The *Kwikset* court relied heavily on the reasoning of its *In re Tobacco II* decision, and made no reference to overruling or modifying its earlier holding.

Furthermore, unlike in *Johns*, plaintiff here does not allege injury based solely on Apple's alleged misrepresentations, but on the diminution in value resulting from the product defect itself, which Apple has already admitted existed in every iPhone model at issue in this case. Thus, "if certification is granted, the proposed class would contain plaintiffs who have personal standing to raise [the] claims [advanced by plaintiff]." *In re Buspirone Patent & Antitrust Litig.*, 185 F.Supp.2d 363, 377 (S.D.N.Y.2002). In this context, the court concludes that Apple's arguments boil down to questions of whether common issues predominate and whether plaintiff can adequately represent absent class members, issues that are better resolved at the class certification stage. The court thus concludes that plaintiff has standing to bring claims on behalf of the proposed class and subclass.

### B. Assertion of Claims under California Law Arising from a Washington–Based Transaction

Apple next argues that under *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581 (9th

Cir.2012), plaintiff cannot assert California law-based claims because he both resides and purchased his iPhone in Washington State. In *Mazza,* the plaintiffs alleged that a car company made various misrepresentations in marketing campaigns regarding a technology package in its cars. The plaintiffs brought claims under four California causes of action: (1) UCL; (2) FAL; (3) CLRA; and (4) unjust enrichment. *Mazza,* 666 F.3d at 587. After certification of a nationwide class by the trial court, the Ninth Circuit considered briefing from the defendant that "exhaustively detailed the ways in which California law differs from the laws of the 43 other jurisdictions." *Id.* at 591. After applying an in-depth choice-of-law analysis, the Court of Appeal vacated the class certification order, finding that "[u]nder the facts and circumstances of this case, we hold that each class member's consumer protection claim should be governed by the consumer protection laws of the jurisdiction in which the transaction took place." *Id.* at 594.

Although *Mazza* may influence the decision whether to certify the proposed class and subclass, such a determination is premature. At this stage in the litigation— before the parties have submitted briefing regarding either choice-of-law or class certification—plaintiff is permitted to assert claims under the laws of different states in the alternative. *See, e.g., In re Sony Grand WEGA KDF-E A10/A20 Series Rear Projection HDTV TV Litig.,* 758 F.Supp.2d 1077, 1096 (S.D.Cal.2010) ("In a putative class action, the Court will not conduct a detailed choice-of-law analysis during the pleading stage."). Moreover, while plaintiff does point to several differences between Washington and California law in his opposition motion, more is needed for Apple to sustain its burden to show that those differences are " 'material,' that is, ... they 'make a difference in this litigation.' " *Bruno v. Eckhart Corp.,* 280

F.R.D. 540, 549 (C.D.Cal.2012) (declining to reconsider a class certification order in light of *Mazza* ) (quoting *Mazza,* 666 F.3d at 590–91). The court therefore declines to dismiss plaintiff's California law-based claims under *Mazza.*

### C. Fraud–Based Claims

Apple's third contention is that plaintiff's fraud-based "consumer protection claims"—specifically, his claims under the UCL, CLRA and WCPA—must be dismissed for failure to comply with Fed. R.Civ.P. 9(b).

Rule 9(b) requires that when fraud is alleged, "a party must state with particularity the circumstances constituting fraud." Fed.R.Civ.P. 9(b). If fraud is not an essential element of a claim, "only those allegations of a complaint which aver fraud are subject to Rule 9(b)'s heightened pleading standard." *Kearns v. Ford Motor Co.,* 567 F.3d 1120, 1124 (9th Cir.2009) (citing *Vess v. Ciba–Geigy Corp. USA,* 317 F.3d 1097, 1106 (9th Cir.2003)). However, where claims allege a "unified course of fraudulent conduct and rely entirely on that course of conduct as the basis of that claim, ... the claim is said to be 'grounded in fraud' or to 'sound in fraud,' and the pleading ... as a whole must satisfy the particularity requirement of Rule 9(b)." *Kearns,* 567 F.3d at 1126 (applying Rule 9(b) standard to uphold dismissal of UCL and CLRA claims that Ford Motor Company and its "co-conspirator" dealerships knowingly misrepresented to the public that certain vehicles were "safer and more reliable"). A complaint meets this standard if it alleges " 'the time, place, and content of the alleged fraudulent misrepresentation or omission; the identity of the person engaged in the fraud; and the circumstances indicating falseness' or 'the manner in which [the] representations [or omissions] were false and misleading.' "

*Genna v. Digital Link Corp.*, 25 F.Supp.2d 1032, 1038 (N.D.Cal.1997) (quoting *In re GlenFed Sec. Litig.*, 42 F.3d 1541, 1547–58 n. 7 (9th Cir.1994)).

The parties do not seriously dispute whether claims based on Apple's alleged misrepresentations or omissions concerning the performance of the iPhone signal meter are subject to the requirements of Rule 9(b).[4] The court therefore considers whether each of plaintiff's allegations can satisfy that standard.

### 1. Affirmative misrepresentation claims

█ A plaintiff asserting causes of action for fraudulent misrepresentation under the UCL, CLRA or WCPA must allege that he was exposed to a particular representation that is claimed to be deceptive. *See, e.g., Baltazar v. Apple, Inc.*, 2011 WL 588209, at *3–4, 2011 U.S. Dist. LEXIS 13187, at *10–11 (N.D.Cal. Feb. 10, 2011); *Minnick v. Clearwire US, LLC*, 683 F.Supp.2d 1179, 1188 (W.D.Wash.2010). The plaintiff must also allege the "specifics" of his reliance upon such misrepresentations. *Baltazar*, 2011 WL 588209, at *3–4, 2011 U.S. Dist. LEXIS 13187, at *10; *Minnick*, 683 F.Supp.2d at 1188.

█ Plaintiff contends that his misrepresentation claim is "not predicated on written misrepresentations," but rather on the fact that his iPhone and the iPhone displayed at the Apple store at the time of his purchase "appeared to work and represent signal strength properly even though it was misrepresenting the signal strength via depictions of the number of bars on the [signal meter]." Dkt. No. 40 at 8; FAC ¶ 147. Plaintiff argues that "nothing in the UCL, CLRA or WCPA appears to preclude visual misrepresentations, which can underpin claims of deceptive conduct." Dkt. No. 40 at 8.

Plaintiff overstates the scope of the consumer protection laws at issue. While it is true that such statutes prohibit the promulgation of misleading "statement[s] or *representation[s]*," *Goldsmith v. Allergan, Inc.*, No. 09–7088 PSG, 2011 WL 2909313, at *3, 2011 U.S. Dist. LEXIS 80998, at *10 (C.D.Cal. May 25, 2011) (emphasis added), plaintiff cites no case holding that a "representation" conveyed by a product's appearance *alone* can give rise to liability for fraud. *Compare id.* (oral misrepresentations made by defendant's sales representative during visits to plaintiff's office); *FTC v. Cyberspace.com, LLC*, 453 F.3d 1196, 1200 (9th Cir.2006) (checks mailed to plaintiffs containing language that created the deceptive impression that the mailings were refunds or rebates rather than an offer for services); *Panag v. Farmers Ins. Co. of Wash.*, 166 Wash.2d 27, 204 P.3d 885, 894 (2009) (notices mailed to plaintiffs whose language and appearance were falsely representative of debt collection notices). Under plaintiff's argument, if a car's dashboard clock were fast or its temperature gauge miscalibrated, the manufacturer would have engaged in an actionable misrepresentation. The court does not understand the UCL, CLRA or WCPA to reach so far, and thus declines to

---

4. Plaintiff contends that under *Faigman v. AT & T Mobility LLC*, No. 06–04622 MHP, 2007 WL 2088561, 2007 U.S. Dist. LEXIS 52192 (N.D.Cal. July 17, 2007), certain claims are subject to an "intermediate standard" which only requires a pleading to include "some specificity ... to put defendants on notice of the charges leveled against them." *Id.* at *4, 2007 U.S. Dist. LEXIS 52192 at *11 (quoting *Nordberg v. Trilegiant Corp.*, 445 F.Supp.2d 1082, 1097–98 (N.D.Cal.2006)). However, as both *Faigman* and *Nordberg* preceded *Kearns*, which clearly held that Rule 9(b) applies to claims alleging a "unified course of fraudulent conduct" under the UCL and CLRA, the court finds that to the extent that *Faigman* articulates a lower standard, it is inapplicable here.

find that the "representations" alleged can give rise to liability under those statutes.

Furthermore, plaintiff's allegations regarding the "sample iPhone display at the Apple store" fail to meet the requirements of Rule 9(b). *See* FAC ¶ 147. Plaintiff does not indicate what the signal meter on the display depicted; he alleges only that the signal meter "appeared . . . to work . . . properly." *Id.* Nor does plaintiff allege that he relied on the information conveyed by the display's signal meter in making his purchase. Such allegations are insufficient to support a claim for fraudulent misrepresentation. *See Kearns,* 567 F.3d at 1126 ("Nowhere in the TAC does Kearns specify what the television advertisements or other sales material specifically stated. . . . Kearns also failed to specify which sales material he relied upon in making his decision to buy a CPO vehicle."). Thus, even if a product displayed at a retail store that falsely appeared to function properly could constitute a "misrepresentation," the FAC does not include enough detail to support plaintiff's claims.

Accordingly, the court grants Apple's motion to dismiss claims under the UCL, CLRA and WCPA based on alleged affirmative misrepresentations. As plaintiff may be able to identify an affirmative misrepresentation concerning the iPhone signal meter, dismissal is granted with leave to amend.

### 2. Omission claims

 To be actionable, an omission must be "contrary to a representation actually made by the defendant, or an omission of a fact the defendant was obliged to disclose." *Baltazar,* 2011 WL 588209, at

*4, 2011 U.S. Dist. LEXIS 13187, at *11 (quoting *Daugherty v. American Honda Motor Co. Inc.,* 144 Cal.App.4th 824, 835, 51 Cal.Rptr.3d 118 (Cal.Ct.App.2006)). A duty to disclose may arise: (1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; or (4) when the defendant makes partial representations but also suppresses some material fact. *Falk v. GMC,* 496 F.Supp.2d 1088, 1094–1095 (N.D.Cal.2007) (citing *LiMandri v. Judkins,* 52 Cal.App.4th 326, 337, 60 Cal. Rptr.2d 539 (Cal.Ct.App.1997)). As the Ninth Circuit has recently cautioned, in the context of product defect claims, "California courts have generally rejected a broad obligation to disclose." *Wilson v. Hewlett–Packard Co.,* 668 F.3d 1136, 1141 (9th Cir.2012).[5]

Here, plaintiff claims that Apple failed to disclose on the "product packaging, via point of sale literature, at Apple retail stores, and otherwise . . . that the iPhone [signal meter] was unreliable, incorrect, defective, and . . . that it was based on a faulty, an unverified and/or inflated formula, [and] that it was designed to depict inflated signal strength." FAC ¶¶ 148–49. Apple does not appear to dispute that the defect in the iPhone signal meter is material; that is, "had the omitted information been disclosed, one would have been aware of it and behaved differently." *Falk,* 496 F.Supp.2d at 1095 (internal citations omitted). Further, as discussed above, the court finds that Apple did not make any affirmative representations concerning the

---

5. The *Wilson* court further noted that courts have generally held that "[a] manufacturer's duty to consumers is limited to its warranty obligations absent either an affirmative misrepresentation or a safety issue." *Wilson v. Hewlett–Packard Co.,* 668 F.3d 1136, 1142 (9th Cir.Cal.2012) (internal citations omitted). However, as neither party has addressed whether the signal meter defect raises a "safety issue" and Apple has not moved to dismiss on this ground, the court will not consider this limitation here.

performance of the signal meter. Therefore, the inquiry turns primarily on whether Apple had a duty to disclose the defect to iPhone purchasers.

### a. Duty to disclose

Plaintiff argues that his allegations are sufficient to meet both the "exclusive knowledge" and "active concealment" requirements to trigger a duty to disclose. Plaintiff points to assertions that Apple conducted its signal meter testing and development in "secret," FAC ¶ 32, and that "Apple was solely in control and responsible for determining what the [signal meter] would display, how it worked, and what customers were told about how to use it." FAC ¶ 70. He also alleges that "unlike makers of other cell phones, Apple programmed its iPhones so as to prevent users from tampering with the hardware and/or software, which further inhibited Plaintiff and the Class from learning about the ... defect." *Id.* ¶ 44.

Apple first responds that it did not conceal "exclusive" knowledge because "if plaintiff experienced issues with his iPhone's ... reception ... he knew it; the signal meter could not disguise his actual experience." Dkt. No. 43 at 14. But while plaintiff may have known that he was having reception problems, it does not follow that he knew his iPhone's signal meter was defective. Unlike the driver of a car with a defective ambient temperature gauge who can put his hand outside the window to determine what the weather is like, a cell phone user has no way to ascertain the "true" strength of his network connection and deduce that his signal meter is inaccurate. Moreover, plaintiff specifically alleges that because Apple effectively prevented consumers from "tampering with" iPhone software, they could not have discovered the signal meter's latent flaw. Plaintiff's allegations thus demonstrate that Apple "was in a superior position to know" about the defect. *Falk,* 496 F.Supp.2d at 1096.

Apple next relies on a series of cases rejecting duty to disclose claims based on product defects that manifested themselves after the expiration of a manufacturer's express warranty. *See Wilson,* 668 F.3d 1136; *Oestreicher v. Alienware Corp.,* 544 F.Supp.2d 964 (N.D.Cal.2008); *Vitt v. Apple Computer, Inc.,* 469 Fed.Appx. 605 (9th Cir.Cal.2012); *Hovsepian v. Apple, Inc.,* No. 08–5788 JF, 2009 WL 5069144, 2009 U.S. Dist. LEXIS 117562 (N.D.Cal. Dec. 17, 2009). For example, in *Oestreicher,* the plaintiff purchased a laptop computer with a three-month warranty. After six months, the laptop stopped working, and the plaintiff brought claims based on the manufacturer's alleged knowledge of a design defect related to the computer's heat management system. The court dismissed the plaintiff's complaint, finding that the "failure of a product to last forever" is not a "defect," and that "a contrary holding would eliminate term limits on warranties, effectively making them perpetual or at least for the 'useful life' of the product." *Oestreicher,* 544 F.Supp.2d at 972 (citing *Daugherty,* 144 Cal.App.4th at 829, 51 Cal. Rptr.3d 118).

By contrast, plaintiff here alleges that his iPhone failed to perform as expected from the moment he purchased it. This case therefore does not raise similar policy concerns regarding potential conflicts between a manufacturer's right to limit its liability under warranty and its duty to disclose known defects. Consequently, the court finds Apple's cited authorities materially distinguishable. *See Baba v. Hewlett–Packard Co.,* No. 09–05946 RS, 2010 WL 2486353, at *4, 2010 U.S. Dist. LEXIS 59747, at *9–10 (N.D. Cal. June 16, 2010) (finding *Oestreicher* and its progeny inapposite because they "involved alleged de-

fects that had manifested themselves after expiration of the warranty period").

■ Finally, Apple argues that plaintiff has failed provide more than "bare legal conclusions" regarding Apple's knowledge of the signal meter's flaw. Dkt. No. 33 at 14 n. 7. In order to give rise to a duty to disclose, a complaint must contain specific allegations demonstrating the manufacturer's knowledge of the alleged defect *at the time of sale*. *See Baba*, 2010 WL 2486353, at *5, 2010 U.S. Dist. LEXIS 59747, at *14–15 (finding allegations that HP knew of a purported defect based on "numerous complaints" and internet postings insufficient to show knowledge at the time of sale because "none of [the] postings or complaints ... include any dates, and therefore shed no light on when HP knew of the alleged defects").

■ Whether plaintiff has demonstrated that Apple knew of the alleged defect when he purchased his iPhone in January 2010 is a close question. On one hand, Apple publicly acknowledged in the July 2 letter that "the mistake has been present since the original iPhone." Dkt. No. 31–1. Plaintiff asserts that the meter was specifically designed to overstate signal strength in order to give Apple a competitive advantage. *See* FAC ¶ 71–72. It could therefore be inferred that Apple knew of the signal meter defect before July 2010, and disclosed the flaw at that time only because the widespread reports of reception problems had begun to hurt sales. On the other hand, the FAC and the July 2 letter both indicate that Apple's investigation into potential problems with the iPhone signal meter was initiated in response to complaints about *the iPhone 4*, which was not released until after plaintiff's purchase. *See* FAC ¶ 33; Dkt. No. 33–1. Plaintiff points to no complaints, data or other information about pre-iPhone 4 models that would have put Apple on notice that such models were similarly defective. *Compare*

*Falk*, 496 F.Supp.2d at 1096–97 (finding evidence of exclusive knowledge where plaintiffs cited numerous complaints about allegedly defective speedometers filed during the time period in question, as well as the fact that dealers had provided General Motors with testing data about the speedometers before the products were sold to the plaintiffs). Plaintiff's allegation that Apple "knew of the defect long before the disclosure" is thus contradicted by the only factual assertions currently before the court. FAC ¶ 72. Because plaintiff has not sufficiently established that Apple knew of the alleged defect in *his* iPhone at the time of purchase, the court grants the motion to dismiss plaintiff's duty to disclose claims under the UCL, CLRA and WCPA with leave to amend.

### D. Non–Fraud Based UCL Claims

In addition to fraud-based claims, plaintiff asserts claims under the "unfair" prong of the UCL based on Apple's "substandard and insufficient" design and testing of the iPhone signal meter. FAC ¶ 140. "California courts have not yet determined how to define 'unfair' in the consumer action context." *Lozano v. AT & T Wireless Servs.*, 504 F.3d 718, 736 (9th Cir.2007). In *Cel–Tech Commc'ns, Inc. v. Los Angeles Cellular Tele. Co.*, 20 Cal.4th 163, 186, 83 Cal.Rptr.2d 548, 973 P.2d 527 (Cal. 1999), the California Supreme Court held that in suits between competitors, unfairness must "be tethered to some legislatively declared policy or proof of some actual or threatened impact on competition." In the wake of *Cel–Tech*, some California courts of appeal considering consumer suits have applied the pre-*Cel–Tech* balancing test, which prohibits conduct that is "immoral, unethical, oppressive or unscrupulous and causes injury to consumers which outweighs its benefits." *McKell v. Washington Mutual, Inc.*, 142 Cal.App.4th 1457, 1473, 49 Cal.Rptr.3d 227 (Cal.Ct.App.

2006). Other courts have applied the three-pronged test contained in the Federal Trade Commission Act, 15 U.S.C. § 45(a), which finds a practice unfair if the consumer injury is substantial, is not outweighed by any countervailing benefits to consumers or to competition, and is not an injury the consumers themselves could reasonably have avoided. *See Camacho v. Auto. Club of S. Cal.*, 142 Cal.App.4th 1394, 48 Cal.Rptr.3d 770 (Cal.Ct.App.2006). This test focuses more on the balance between consumer injury and the utility of a defendant's conduct than whether a business practice is "deceptive or sharp." *S. Bay Chevrolet v. GM Acceptance Corp.*, 72 Cal.App.4th 861, 887, 85 Cal.Rptr.2d 301 (Cal.Ct.App.1999). While both tests have been cited by numerous state a federal courts in recent years, the Ninth Circuit has rejected the viability of the *Camacho* standard "in the absence of a clear holding from the California Supreme Court." *Lozano*, 504 F.3d at 736. This court therefore applies the balancing test articulated in *McKell*.

■■■ Here, it is hard to see how Apple's choice to develop its own formula in designing the iPhone signal meter could be characterized as "immoral, unethical, oppressive or unscrupulous." Many of Silicon Valley's greatest innovations have resulted from decisions to reject the status quo in favor of new approaches to old problems. Without any facts supporting plaintiff's conclusory claim that Apple *knowingly* or *purposefully* designed the iPhone signal meter to artificially inflate apparent signal strength, the court is loath to pass judgment on a design decision that is clear only in hindsight to have been a mistake. Indeed, as plaintiff cites no authority finding that a product design alone can constitute unfair conduct without related misrepresentations or omissions, the court is not even certain that the UCL is applicable to the allegations at hand. In addition, while plaintiff claims that Apple's conduct was "contrary to industry standards," it cites no specific evidence—such as the testing processes or formulas used by other smartphone vendors—supporting this proposition. Accordingly, the court grants Apple's motion to dismiss plaintiff's claims under the "unfair" prong of the UCL with leave to amend.

### E. Warranty Claims

#### 1. Pre-suit notice

Plaintiff's breach of express warranty claim is based on the allegation that the User Guide falsely promised that the signal meter would accurately depict signal strength. *See* FAC ¶ 112. His implied warranty claim alleges that "faulty signal meters rendered [class members'] phones unfit for ordinary use." FAC ¶ 107. Plaintiff also asserts a claim under the federal Magnuson Moss Warranty Act ("MMWA"), 15 U.S.C. §§ 2301–12, based on the same alleged breaches. FAC ¶ 124.

Apple argues that each of plaintiff's warranty claims must be dismissed because he did not provide notice of the alleged breaches until December 5, 2011, more than one month after the filing of plaintiff's original complaint.[6] *See* Dkt. No. 34–1, Ex. C. Because the court finds that

---

**6.** Plaintiff does not plead the exact date upon which notice was given. However, he alleges that he notified Apple orally and in writing within a reasonable time after discovering the breach. FAC ¶ 117. The court therefore takes judicial notice of the date of plaintiff's notification letter submitted by Apple under the incorporation by reference doctrine. *See*

*Dunn v. Castro,* 621 F.3d 1196, 1205 n. 6 (9th Cir.2010) ("Under the 'incorporation by reference' doctrine, we may consider documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are *not physically attached to the* [plaintiff's] pleading.") (internal citation and quotation marks omitted).

plaintiff's failure to give pre-suit notice bars his warranty claims under California, Washington and federal law, the court does not address the questions of whether the User Guide can give rise to warranty obligations or whether plaintiff's allegations meet the substantive elements required to state express or implied warranty claims at this time.

### a. Warranty claims asserted under California law

To avoid dismissal of a breach of warranty claim in California, "[a] buyer must plead that notice of the alleged breach was provided to the seller within a reasonable time after discovery of the breach." *Alvarez v. Chevron Corp.*, 656 F.3d 925, 932 (9th Cir.2011) (internal citations omitted); *see also* Cal. Com. Code § 2607(3)(A) ("The buyer must, within a reasonable time after he or she discovers or should have discovered any breach, notify the seller of breach or be barred from any remedy[.]"). The purpose of the notice requirement is to allow the breaching party to cure the breach and thereby avoid the necessity of litigating the matter in court. *See Cardinal Health 301, Inc. v. Tyco Elecs. Corp.*, 169 Cal.App.4th 116, 135, 87 Cal.Rptr.3d 5 (Cal.Ct.App.2008). The Ninth Circuit has therefore construed Cal. Com. Code § 2607(3)(A) to require the plaintiff to show that he has given the seller notice of the breach before filing suit. *See Alvarez*, 656 F.3d at 932 (upholding dismissal of express and implied warranty claims with prejudice where the undisputed evidence established that the plaintiffs sent a notice letter simultaneously with the complaint).

Plaintiff contends that *Alvarez* is inapplicable here because while he did not provide notice before filing suit, Apple was notified of its alleged breach before he filed his *amended* complaint, in which he asserted warranty claims for the first time. Plaintiff argues that barring his claims

under these circumstances would preclude aggrieved parties from bringing warranty claims based on facts identified after the filing of an initial complaint. He further implies that dismissing claims asserted for the first time in an amended complaint would frustrate the purposes of Fed. R.Civ.P. 15, which provides for the filing of amended and supplemental pleadings.

Although plaintiff's position has some appeal, it is unavailing here. First, the *Alvarez* court rejected a similar argument by expressly overruling *Hampton v. Gebhardt's Chili Powder Co.*, 294 F.2d 172, 173–74 (9th Cir.1961), which had concluded that a warranty claim could proceed although the plaintiff did not allege she had provided notice until filing a supplemental pleading more than six months after first filing suit. *See Alvarez*, 656 F.3d at 932. Second, plaintiff has not indicated that his warranty claims are based on facts discovered after he first filed suit. Indeed, by the time plaintiff sent notice to Apple, he was already litigating substantially similar claims based on the same facts that underlie his warranty claims. *See* Dkt. No. 1. Given this posture, allowing plaintiff to assert a warranty claim without first giving notice would completely eliminate Apple's "opportunity to repair the defective item" or "negotiate [a] settlement" before the initiation of litigation. *Cardinal Health 301, Inc.*, 169 Cal.App.4th at 135, 87 Cal.Rptr.3d 5. It would also invite gamesmanship by plaintiffs who know they intend to assert a warranty claim but want to avoid giving a defendant notice before filing suit. The court thus grants the motion to dismiss plaintiff's breach of express and implied warranty claims under California law. Because there appears to be no dispute as to whether plaintiff gave Apple pre-suit notice of its alleged breach or whether plaintiff had knowledge of the facts supporting his warranty claims be-

fore filing his original complaint, dismissal of this claim is with prejudice.

### b. Warranty claims asserted under Washington law

 Washington law similarly requires a plaintiff asserting a claim for breach of warranty to plead that notice has been given within a "reasonable time" after discovering the alleged breach. *See* Rev. Code Wash. § 62A.2–607; *Kasey v. Suburban Gas Heat,* 60 Wash.2d 468, 474, 374 P.2d 549 (Wash.1962). Plaintiff claims that Washington courts "liberally construe" this provision, implying that his warranty claim under Washington law should survive even if his California law-based claim is dismissed. Dkt. No. 40 at 20. However, plaintiff cites no authority considering whether Washington law requires pre-suit notice of an alleged breach, and the court has found none. Given that plaintiff plainly had notice of the purported breach of the "warranties" expressed in the User Guide before filing suit but did not inform Apple of his intention to file a warranty claim until more than a month later, the court finds as matter of law that plaintiff failed comply with the requirements of Rev. Code Wash. § 62A.2–607. *See Bleyhl v. Tea Garden Prods. Co.,* 30 Wash.2d 447, 458, 191 P.2d 851 (Wash. 1948) ("In some cases the undisputed factual situation may be such that the court can say as a matter of law whether a certain thing required was or was not done within a reasonable time."). However, because it is not clear that pre-suit notice is an absolute requirement under Washington law, plaintiff may amend his complaint to show why it was not unreasonable to delay giving Apple notice of his intent to assert a warranty claim until December 5, 2011.

### c. Warranty claims under federal law

The notice requirement applies with equal force to claims brought under the MMWA. *See Birdsong v. Apple, Inc.,* 590 F.3d 955, 958 n. 2 (9th Cir.2009) (MMWA claims are analyzed under state warranty law); *Clemens v. DaimlerChrysler Corp.,* 534 F.3d 1017, 1022 (9th Cir.2008) ("Disposition of the state law warranty claims determines the disposition of the Magnusson–Moss Act claims."). Because the court dismisses plaintiff's state warranty claims, his MMWA claim is dismissed as well. Plaintiff may amend the federal claim to the extent that it is based on a violation of Washington law.

## F. Contract Claims

### 1. Breach of express contract

 In order to state a claim for breach of contract, a plaintiff must plead the existence of a contract, his performance of the contract or excuse for nonperformance, the defendant's breach and resulting damages. *Otworth v. Southern Pac. Transportation Co.,* 166 Cal.App.3d 452, 458, 212 Cal.Rptr. 743 (Cal.Ct.App. 1985). A contract may be written, oral or implied by conduct. *Id.; see also Multicare Medical Ctr. v. Dep't of Soc. & Health Servs.,* 114 Wash.2d 572, 790 P.2d 124, 137 (1990) (intention to contract may be manifested by conduct or words) (citing Restatement (Second) of Contracts § 18 (1979)). The complaint must identify the specific provision of the contract allegedly breached by the defendant. *See Progressive West Ins. Co. v. Superior Court,* 135 Cal.App.4th 263, 281, 37 Cal.Rptr.3d 434 (Cal.Ct.App.2005).

 Here, plaintiff alleges that "the contract for the purchase of the iPhone[ ] included a promise to provide a working signal meter." FAC ¶ 89. Plaintiff claims that such a promise is implied by the facts that: (1) the User Guide indicates "that the signal meter ... can be properly used to trace whether the user is within sufficient range of the cellular network;" and

(2) the sample iPhone on display at the Apple retail store and the actual phone plaintiff purchased appeared to contain working signal meters. *See* FAC ¶ 87, 51. Plaintiff asserts that Apple's failure to provide him with a properly functioning signal meter thus breached an express term of the parties' sales contract. *Id.* ¶ 88.

Apple argues that the User Guide is merely an instruction manual, and therefore does not give rise contractual obligations. The court agrees. A review of the User Guide shows that it provides directions for using an iPhone and descriptions of the device's functions, but includes no "promises" which plaintiff could have "accepted." *See* Dkt. No. 34–1, Ex. A; *Donovan v. RRL Corp.,* 26 Cal.4th 261, 271, 109 Cal.Rptr.2d 807, 27 P.3d 702 (Cal. 2001) (contract formation requires an "offer communicated to the offeree and an acceptance communicated to the offeror."). Plaintiff does not even allege that he saw the User Guide before purchasing his iPhone, further undermining his claim that he accepted its terms as part of a contract of sale. *Compare Stomp, Inc. v. NeatO,* 61 F.Supp.2d 1074, 1081 n. 11 (C.D.Cal. 1999) ("shrinkwrap agreements" placed inside the cellophane packaging of computer software boxes may be enforceable because *"by their terms,* [they] become effective once the "shrinkwrap" is opened") (emphasis added). Nor does the User Guide reasonably suggest that Apple intended to be "bound" by its provisions, which include wide-ranging instructions on topics like "sending voice memos" and "adding calendar events." *See Alexander v. Codemasters Group Ltd.,* 104 Cal. App.4th 129, 141, 127 Cal.Rptr.2d 145 (Cal. Ct.App.2002) ("[M]utual consent is determined under an objective standard applied to outward manifestations or expressions of the parties, i.e., the reasonable meaning of their words and acts....."). On these facts, adopting the position that an instructional manual is a contract would vastly expand the scope of a manufacturer's express and implied warranties, creating a perverse incentive for manufacturers to avoid including comprehensive manuals with their products.

Plaintiff's cited authorities—in addition to being non-binding on this court—are factually distinguishable from the case at hand. For example, in *Kaiser–Flores v. Lowe's Home Ctrs., Inc.,* No. 08–45–V, 2009 WL 762198, 2009 U.S. Dist. LEXIS 28300 (W.D.N.C. Mar. 19, 2009), the court accepted as true the plaintiff's allegation that safety warnings included in an instruction manual were incorporated into the defendant's obligation to install a dryer "in a manner consistent with the manufacturer's requirements." *Id.* at *4, 2009 U.S. Dist. LEXIS at *16. By contrast, plaintiff has not alleged that the defective signal meter raised safety concerns or that the User Guide provided any "warnings" with which Apple failed to comply. Similarly, *Peoples Gas System, Inc. v. RSH Constructors, Inc.,* 563 So.2d 107, 110 (Fla. Ct.App.1990) is inapposite because it concerned whether *explicitly contractual language* in a separately-executed "project manual" was incorporated into the parties' written construction contract.

The court also finds unpersuasive plaintiff's contention that because the User Guide expressly disclaims liability for the performance of third-party applications, Apple implicitly accepted liability for any defect in the performance of its own technology. *See* Dkt. No. 34–1, Ex. A at 217. Simply put, limiting liability for certain defects does not automatically render a manufacturer liable for all other defects.

Plaintiff's other argument—that the ostensibly functioning iPhone on display at the Apple store establishes the existence of a contract—is not supported by any authority at all. As noted above, plaintiff has not explained what the display iPhone

depicted, why he believed it to be properly functioning, or what, if any, written or oral representations accompanying the display conveyed the impression that the signal meter in the iPhone he purchased would be "accurate." Without more detail, the court cannot conclude that the presence of a product at a retail store that "appears" to function in a certain way gives rise to an express contractual obligation to deliver a product that conforms with a buyer's unstated expectations.

Accordingly, the court concludes that Apple did not breach an express term of its contract with plaintiff by failing to provide him with an iPhone containing a working signal meter. However, because plaintiff may be able to allege facts showing the existence and breach of such an obligation, the court dismisses plaintiff's breach of contract claim with leave to amend.

### 2. Breach of implied covenant of good faith and fair dealing

■■■■ "Every contract contains an implied covenant of good faith and fair dealing that neither party will do anything which will injure the right of the other to receive the benefits of the agreement." *Wolf v. Walt Disney Pictures and Television*, 162 Cal.App.4th 1107, 1120, 76 Cal. Rptr.3d 585 (Cal.Ct.App.2008). "The covenant is implied ... to prevent a contracting party from engaging in conduct which (while not technically transgressing the express covenant) frustrates the other party's rights of the benefits of the contract." *Marsu, B.V. v. Walt Disney Co.*, 185 F.3d 932, 938 (9th Cir.1999) (quoting *Los Angeles Equestrian Ctr., Inc. v. City of Los Angeles*, 17 Cal.App.4th 432, 447, 21 Cal. Rptr.2d 313 (Cal.Ct.App.1993)). A "breach of a specific provision of the contract is not a necessary prerequisite" to a breach of an implied covenant of good faith and fair dealing. *Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.*, 2

Cal.4th 342, 373, 6 Cal.Rptr.2d 467, 826 P.2d 710 (Cal.1992). However, the implied covenant is "limited to assuring compliance with the express terms of the contract, and cannot be extended to create obligations not contemplated by the contract." *Pasadena Live, LLC v. City of Pasadena*, 114 Cal.App.4th 1089, 1094, 8 Cal.Rptr.3d 233 (Cal.Ct.App.2004) (internal citation omitted).

Plaintiff's breach of the implied covenant claim is premised solely on the argument that the User Guide created an express obligation to provide him with a working signal meter. *See* Dkt. No. 40 at 19. As the court has rejected this argument in dismissing plaintiff's contract claim, plaintiff's breach of the implied covenant claim is also dismissed with leave to amend.

### G. Restitution Claim

■■■■ Under California law, restitution and unjust enrichment are generally thought of not as causes of action, but "general principle[s] underlying various legal doctrines and remedies." *McBride v. Boughton*, 123 Cal.App.4th 379, 387, 20 Cal.Rptr.3d 115 (Cal.Ct.App.2004) (internal citation omitted); *but see Nordberg*, 445 F.Supp.2d at 1100 (noting that some California courts recognize restitution or unjust enrichment claims). Restitution may be available where the defendant "obtained a benefit from the plaintiff by fraud, duress, conversion, or similar conduct." *McBride*, 123 Cal.App.4th at 388, 20 Cal. Rptr.3d 115. Restitution and unjust enrichment are a stand-alone causes of action under Washington law, but their analytical underpinnings are essentially the same as in California. *See Young v. Young*, 164 Wash.2d 477, 484, 191 P.3d 1258 (Wash. 2008) ("Unjust enrichment is the method of recovery for the value of the benefit retained absent any contractual relation-

ship because notions of fairness and justice require it.").

Here, plaintiff indicates that his restitution claim is based on Apple's alleged fraud, and is pleaded in the alternative to his breach of contract claims. The court agrees that if plaintiff prevails on his consumer protection claims but not under a contract theory, he may seek recovery in the form of restitution. *See, e.g., Nordberg*, 445 F.Supp.2d at 1101 n. 15 ("The California Unfair Competition Law is equitable in nature and plaintiffs that prevail under the UCL are 'generally limited to injunctive relief and restitution.'") (quoting *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.4th 1134, 1144, 131 Cal. Rptr.2d 29, 63 P.3d 937 (Cal.2003)). However, as plaintiff has failed to sufficiently plead an actionable misrepresentation or omission, his restitution claim must be dismissed. *See Meaunrit v. Pinnacle Foods Group, LLC*, No. 09–04555 CW, 2010 WL 1838715, at *13, 2010 U.S. Dist. LEXIS 43858, at *36 (N.D.Cal.2010) ("Plaintiffs' unjust enrichment and restitution claim fails because they have not stated a predicate claim warranting such relief."). If plaintiff chooses to amend his complaint, he may reassert a claim for restitution under Washington law, and include a request for restitution in his prayer for relief pursuant to California law.

### III. ORDER

For the foregoing reasons, the court grants Apple's motion to dismiss plaintiff's claims for breach of contract, breach of the implied covenant of good faith and fair dealing, breach of warranty under Washington law and the MMWA, violation of Cal. Bus. & Prof. Code § 17200, violation of the CLRA, violation of the WCPA, and restitution under Washington law with leave to amend. Any amended pleading must be filed within thirty days of the date of this order. Plaintiff's claims for breach of implied and express warranty under California law are dismissed with prejudice.